UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BERNARDO CACERES,

                        Plaintiff,

    -against-

NEW YORK CITY DEPARTMENT OF
CORRECTIONS OFFICER NATHANIEL
WILLIAMSON, in his individual capacity; NEW
YORK CITY DEPARTMENT OF
CORRECTIONS OFFICERS "JOHN and JANE
DOES" #1-8, in their individual capacities; THE
CITY OF NEW YORK; NEW YORK CITY
CORRECTION OFFICERS' BENEVOLENT
ASSOCIATION PRESIDENT BENNY BOSCIO;
NEW YORK CITY CORRECTION OFFICERS'
BENEVOLENT ASSOCIATION,

                        Defendants.

**COMPLAINT AND JURY
TRIAL DEMAND**

Case No. 1:26-cv-4914

Plaintiff Bernardo Caceres, by and through his attorneys, Emery Celli

Brinckerhoff Abady Ward & Maazel LLP and Caicedo & Queliz LLC, alleges as follows for his

complaint:

## PRELIMINARY STATEMENT

1. On June 11, 2025, Bernardo Caceres, an attorney with the Queens Defenders,

traveled to Rikers Island Correctional Facility ("Rikers Island") to visit a client. Upon exiting the

interview with his client, Mr. Caceres was falsely arrested, confined, and charged with

attempting to smuggle narcotics into Rikers Island. No probable cause existed to support Mr.

Caceres's arrest, and a laboratory test later confirmed that he did not have any narcotics with

him.

1

2.      On June 11, 2025, Mr. Caceres traveled to Rikers Island to meet with a client who was in the early stages of a trial.

3.      Mr. Caceres brought with him crucial documents to review with his client in order to adequately prepare him for trial.

4.      After meeting with his client, Mr. Caceres was detained by corrections officers in a small room and was not allowed to contact his supervisors at the Queens Defenders.

5.      After being detained for hours, Mr. Caceres was told that the documents he brought to share with his client had tested positive for tetrahydrocannabinol ("THC") and he was being arrested for promoting prison contraband.

6.      Mr. Caceres was arrested based on a positive field test, even though the New York City Department of Investigation ("DOI") and the New York Department of Corrections ("DOC") acknowledge that field tests are so unreliable that they should not form the basis for an arrest unless they are confirmed by a laboratory test.

7.      DOC was on notice and was aware that a positive field test for narcotics could not serve as the basis of probable cause for an arrest.

8.      Nevertheless, Mr. Caceres was handcuffed, held for many hours at Rikers Island, and eventually issued a desk appearance ticket ("DAT") to answer for the charge of promoting prison contraband.

9.      Of course, Mr. Caceres was not bringing THC-laced documents into Rikers Island, and when the documents were tested in the laboratory, they returned a negative result for any narcotics. The Bronx County District Attorney subsequently dropped the charges against Mr. Caceres.

2

10.    On June 13, 2025, in an apparent bid to promote its political campaign of banning visitors from bringing documents to DOC facilities, New York City Correction Officers' Benevolent Association ("COBA") released an indefensible and defamatory statement regarding Mr. Caceres, referring to him as a "drug peddling attorney," and plastered a photograph of him in handcuffs across the top of the release—a photograph that was subsequently used in an article run by the New York Post.

11.    Since Mr. Caceres's unlawful arrest and detention, Mr. Caceres has experienced significant harm to his reputation as an individual and as a lawyer, fear around law enforcement, and insomnia. Mr. Caceres now seeks redress for Defendants' unlawful confinement and arrest, unwarranted abuse of authority, and defamatory statements.

## THE PARTIES

12.    Plaintiff BERNARDO CACERES ("Plaintiff" or "Mr. Caceres") is a citizen of the United States and a 31-year-old man who currently, and at all times relevant to this Complaint, lives in Brooklyn, New York. Mr. Caceres is, and was at all times relevant to this Complaint, licensed to practice law in the State of New York.

13.    Defendant NATHANIEL WILLIAMSON ("Defendant Williamson" or "Williamson"), Tax ID No. 509919, was, at all times relevant to this complaint, an officer employed by DOC and the City of New York and assigned to the Correction Intelligence Bureau ("CIB"). In his role, Williamson was a duly appointed and acting officer, servant, employee, and/or agent of the City of New York. At all relevant times, he acted within the scope of his employment and under color of state law. Defendant Williamson is sued in his individual capacity.

14.     Defendants DOC OFFICERS JOHN AND JANE DOES #1-8 (collectively "Does #1-8"), full names and Tax IDs unknown, were each at all relevant times DOC employees and each was a duly appointed and acting officer, servant, employee, and/or agent of the City of New York. At all relevant times, Defendants Does #1-8 acted within the scope of their employment and under color of state law. Defendants Does #1-8 are sued in their individual capacities. On information and belief, Defendants Does #1-8 include, but are not limited to, Correction Officers Calloway, Fisher, and Iqbal; K9 Officers Joseph-Pauline and Valera; and CIB Officer Vasquez. The first names and Tax ID/Badge Numbers of Officers Calloway, Fisher, Iqbal, Joseph-Pauline, Valera, and Vasquez are unknown.

15.     Defendant CITY OF NEW YORK is a municipal corporation duly organized under the laws of the State of New York. At all times relevant hereto, the City of New York, acting through the DOC, was responsible for the policy, practice, supervision, implementation, and conduct of all DOC matters, including the appointment, training, supervision, and conduct of all DOC personnel. In addition, at all relevant times, the City of New York was responsible for enforcing the rules of the DOC and for ensuring that DOC personnel, including Defendant Williamson and Does #1-8, obey the laws of the United States and of the State of New York.

16.     Defendant BENNY BOSCIO is, and was at all relevant times to this Complaint, President of the New York City Correction Officers' Benevolent Association. At all relevant times to this Complaint, Defendant Boscio was acting within the scope of his employment as the President of COBA.

17.     Defendant New York City Correction Officers' Benevolent Association is a 501(c)(5) Union incorporated in the State of New York and its principal place of business is in the State of New York.

4

## JURISDICTION AND VENUE

18.     This action arises under the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and New York State and New York City law.

19.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4). Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. §1367, over any and all State law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that give rise to the federally based claims and causes of action.

20.     The acts complained of occurred in the Southern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

21.     Plaintiff demands a trial by jury in this action.

## FACTUAL ALLEGATIONS

### DOC Narcotics Testing Procedures

22.     If a DOC employee suspects that a visitor to Rikers Island is carrying prohibited narcotics, he or she field tests the substance to obtain a preliminary result as to whether it is a prohibited narcotic.[1]

23.     The field test used by DOC prior to April of 2023 was the Sirchie Nark II, but at the time of Mr. Caceres's arrest, DOC used the MobileDetect field test, manufactured by DetectaChem.[2]

---

[1] *See Field Testing for Fentanyl: An Examination of the Reliability of New York City Department of Corrections Narcotics Testing*, New York City Department of Investigation, at 13 (Nov. 2024), https://www.nyc.gov/assets/doi/reports/pdf/2024/FieldTestingRpt11.20.2024.pdf ("2024 DOI Report").
[2] *Id.* at 10.

24.     DetectaChem specifically warns that any results obtained from its MobileDetect field tests are presumptive and should be confirmed by laboratory tests.[3]

25.     DOC recognizes that field tests are insufficiently reliable to form the basis for an arrest. DOC itself instructs its officers that when a field test provides a positive result for an illicit narcotic on an item that a visitor has brought into a facility, the officer should voucher and submit the item for laboratory testing and retrieve the pedigree information from the visitor. Only upon a later confirmatory laboratory test should a visitor be arrested.[4]

26.     This is because the MobileDetect field test has a false positive rate of at least 79%—and up to 85% when it is testing for fentanyl.[5]

27.     DOI has also recommended that DOC produce a *written policy* prohibiting the arrest of any person based solely on a positive field test result.[6]

### *Mr. Caceres Works Incredibly Hard to Become an Attorney at Queens Defenders*

28.     Mr. Caceres was raised in South Williamsburg, Brooklyn. After graduating from high school, he attended Bard College, where he intended to use his education to assist people in his community in New York City.

29.     While he was attending college, Mr. Caceres worked outside jobs in order to fund his education. Often, he would work jobs for 30 to 35 hours a week on top of his undergraduate studies.

30.      This work paid off. Two years after graduating from Bard, Mr. Caceres attended Cardozo Law School with a large scholarship.

---

[3] *Id.*; *see also* DetectaChem CBD/THC Test Pouch (10 Count) Purchase Page, https://detectachem.com/product/thc-cbd-drug-test-pouch/(last visited June 2, 2026) (noting that "[r]esults obtained from MobileDetect are presumptive and should be confirmed using laboratory equipment").

[4] 2024 DOI Report, *supra* note 1, at 13.

[5] *Id.* at 3.

[6] *Id.* at 16.

31.     Mr. Caceres attended Cardozo Law School with the goal of becoming a public defender in New York City, his hometown.

32.     Upon graduation in 2020, and after sitting for the New York Bar Exam, Mr. Caceres started a job as an attorney with the Queens Defenders.

33.     At the Queens Defenders, Mr. Caceres represented his clients vigorously, compassionately, and skillfully. By June of 2025, he had risen through the ranks to be a fully-certified felony public defender, handling all types of cases but homicides.

34.     Mr. Caceres built his career at Queens Defenders on a reputation of hard work and honesty—the sort of reputation that is vital to maintain for continued success in the legal profession.

### *Mr. Caceres Represents Luis DeJesus Through His Work at Queens Defenders*

35.     In June of 2025, Mr. Caceres, along with attorney Peter Dufault, represented Luis DeJesus in Queens County Supreme Court, Criminal Term. Mr. DeJesus was charged with Second Degree Robbery.

36.     Mr. Caceres had represented Mr. DeJesus since 2023. Mr. Caceres had a deep knowledge and understanding of Mr. DeJesus's case and had also developed the sort of lawyer-client relationship with Mr. DeJesus that is critical for effective representation.

37.     Pending trial, Mr. DeJesus was being held at Rikers Island, located in Bronx County.

38.     By June 2025, Mr. DeJesus's case was in the early stage of trial. *Voir dire* had been conducted, and the court was ruling on preliminary motions.

39.     Mr. Caceres and Mr. Dufault made a plan to visit Mr. DeJesus at Rikers Island on June 11, 2025 to prepare Mr. DeJesus for trial.

*Mr. Caceres Visits Rikers Island on June 11, 2025*

40.     In order to properly prepare Mr. DeJesus for his testimony, Mr. Caceres needed to provide him with over 100 pages of documents from discovery to review ("Discovery Documents").

41.     Mr. Caceres printed those documents in his office at the Queens Defenders, paperclipped them together, and placed them in a bag to provide to Mr. DeJesus.

42.     Mr. Caceres also had court clothes to give Mr. DeJesus that had been provided by Mr. DeJesus's family.

43.     Mr. Caceres thoroughly checked the clothes provided by Mr. DeJesus's family for contraband before placing them in the bag along with the documents he was going to provide to Mr. DeJesus.

44.     On the morning of June 11, 2025, at approximately 10:30am, Mr. Caceres arrived at the parking lot located on the Queens side of the Rikers Island Bridge.

45.     At that parking lot, Mr. Caceres met his co-counsel, Mr. Dufault, and they traveled across the Rikers Island Bridge together in Mr. Dufault's vehicle.

46.     At this point, Mr. Caceres had with him the bag containing materials to provide to Mr. DeJesus and his own briefcase containing trial documents.

*Mr. Caceres Passes Through the Initial Security Check at Rikers Island*

47.     After arriving at Rikers Island in Mr. Dufault's vehicle, Mr. Caceres proceeded to register at the Samuel L. Perry Building.

48.     Mr. Caceres wanted to ensure that he was following all of the facility's rules for visitation. As such, Mr. Caceres immediately told the corrections officer manning the desk at the Samuel L. Perry Building that he had materials to provide his client.

49. The corrections officers at check in searched through the bag with the materials Mr. Caceres planned to provide Mr. DeJesus and removed the paperclips from the documents, leaving them as loose papers in the bag.

50. Mr. Caceres and Mr. Dufault then boarded a bus to be taken to the Otis Bantum Correctional Center ("OBCC"), where Mr. DeJesus was housed.

*Mr. Caceres Passes Through Security at OBCC and Visits with Mr. DeJesus*

51. Upon arrival at OBCC, Mr. Caceres asked the corrections officers at the security checkpoint about the procedure for providing his client with the Discovery Documents.

52. The officers at OBCC told Mr. Caceres to put the bag with the documents and clothes on a shelf just past the metal detector.

53. Mr. Caceres complied, and after passing through the metal detector, he placed the bag with the Discovery Documents and his client's clothes on the shelf.

54. At approximately 1:30pm, Mr. Caceres and Mr. Dufault proceeded into an interview room to meet with Mr. DeJesus. Mr. Caceres did not bring the Discovery Documents into the interview room. Mr. Caceres only had his personal briefcase with trial documents.

55. Approximately 30 minutes into meeting with Mr. DeJesus, Mr. Caceres left the interview room to check if he could bring the Discovery Documents into the room to show Mr. DeJesus.

56. Mr. Caceres approached a correctional officer near the shelf where he had left the bag with the Discovery Documents and asked if he could bring them into the interview room with his client.

57. The correctional officer told Mr. Caceres that he could bring the Discovery Documents into the interview room and give them to Mr. DeJesus.

58.    Mr. Caceres retrieved the Discovery Documents, returned to the interview room, and continued meeting with Mr. DeJesus for around 30 more minutes.

59.    At the conclusion of the meeting, Mr. Caceres left the Discovery Documents with Mr. DeJesus, and Mr. Caceres and Mr. Dufault exited the interview room.

***Mr. Caceres Is Unlawfully Detained for Approximately Two Hours at OBCC***

60.    Upon exiting the interview room, Mr. Caceres and Mr. Dufault were met by a corrections officer in the main waiting area, John Doe #1, who told them that they were not free to leave.

61.    Also in the main waiting area were other correctional officers—some with long guns—and one man in a business suit, Does #2-7. Defendant Williamson was also in the main waiting area.

62.    Upon information and belief, Does #1-7 include but are not limited to Correction Officers Calloway, Fisher, and Iqbal; K9 Officers Joseph-Pauline and Valera; and Correction CIB Officer Vasquez.

63.    Mr. Caceres was told by one of the officers that "there was an alert from our K9 unit on [his] stuff" and he and Mr. Dufault were directed to proceed into a small room with two chairs.

64.    Mr. Caceres and Mr. Dufault waited in a cramped room that was just large enough to fit the two chairs they were sitting on.

65.    Mr. Caceres and Mr. Dufault were made to wait in that room for approximately two hours.

66.    Mr. Caceres was denied his request to make a phone call to his supervisor at Queens Defenders.

67.    At this juncture, Mr. Caceres was not free to leave and was clearly under arrest.

68.    Upon information and belief, at some point while Mr. Caceres and Mr. Dufault were waiting in the small room with two chairs, an officer had taken the Discovery Documents and requested they be field tested for narcotics.

69.    At or around 4pm, Mr. Caceres was told by Officer Vasquez—a Doe Defendant— that the Discovery Documents had tested positive for trace amounts of THC, the primary psychoactive compound in the cannabis plant.

*Mr. Caceres Is Handcuffed, Subjected to Ridicule, Photographed, and Moved to a New Location Where He is Held for At Least Three More Hours and Charged with Promoting Prison Contraband Before He Is Eventually Released*

70.    On information and belief, the test which identified trace amounts of THC was the MobileDetect filed test manufactured by DetectaChem. As described *supra*, the MobileDetect field test, along with *any* narcotics field test, delivers presumptive and inaccurate results. Those results must be confirmed by a laboratory test to support an arrest.

71.    As such, and also as explained *supra*, corrections officers are not supposed to make an arrest relying on a presumptive field test, and must first have the results confirmed by a laboratory test to make an arrest.

72.    Upon information and belief, DOC and its personnel were aware of the requirement that a presumptive field test returning a positive result for narcotics must be confirmed by a laboratory test to provide the basis for an arrest.

73.    Nevertheless, Officer Vasquez informed Mr. Caceres that he was being arrested for promoting prison contraband, handcuffed him, and led him out of OBCC.

74. On information and belief, there had been no confirmatory laboratory test conducted on the Discovery Documents before Mr. Caceres was handcuffed and arrested for promoting prison contraband.

75. Upon stepping out the door of OBCC, Mr. Caceres was met by a crowd of corrections officers. The officers were congratulating Officer Vasquez and taunting Mr. Caceres.

76. One individual was taking pictures of Mr. Caceres as he was being led out of OBCC. Mr. Caceres attempted to cover his face, at which point he was again taunted by the crowd of corrections officers.

77. Mr. Caceres and Mr. Dufault were placed in the back of a corrections vehicle and driven by corrections officers to a different facility on Rikers Island where they were placed in separate holding cells.

78. Mr. Caceres continued to request to call his supervisor at the Queens Defenders, and he was again told that was not possible.

79. At around 5:30pm, Mr. Dufault was released, but Mr. Caceres was told he was still being held.

80. At or around 7:55pm, Mr. Caceres was told that he was being released, but that he was also being charged with promoting prison contraband.

81. Mr. Caceres requested that his cell phone be returned to him—a request which was denied, even though the phone was vouchered for "safe keeping," not evidence.

82. Mr. Caceres was given a DAT, signed by Defendant Williamson as the arresting officer. The DAT commanded Mr. Caceres to appear in criminal court in the Bronx on July 1, 2025 to answer for the charge of Promoting Prison Contraband in the Second Degree, a violation of Penal Law Section 205.20.

83.    Even though Mr. Caceres was being released, his handcuffs were still not removed. Another corrections officer, Doe #8, commanded Mr. Caceres to put his hands behind his back so he could be handcuffed from behind.

84.    When Mr. Caceres asked why he was being handcuffed again, Doe #8 told him that he was "not getting released yet," and proceeded to roughly and aggressively push Mr. Caceres into the back of a vehicle.

85.    Mr. Caceres was taken back across Rikers Island Bridge and left at his vehicle he had parked that morning.

***On July 1, 2025, the Charges Against Mr. Caceres Are Dropped as Laboratory Testing Confirms That the Discovery Documents Did Not Contain THC, But the Damage to Mr. Caceres Had Already Been Done***

86.    On July 1, 2025, the Bronx District Attorney informed Mr. Caceres that it was not going to proceed with the charge of promoting prison contraband, and he did not need to appear in court as he was commanded to on his DAT.

87.    On information and belief, the District Attorney declined to pursue the charges against Mr. Caceres because a confirmatory laboratory test of the Discovery Documents found that they *did not* contain THC or any other illicit narcotics.

88.    This is the same sort of confirmatory laboratory test that should have been done *prior* to the arrest of Mr. Caceres.

89.    Beyond the immediate injury of the loss of liberty caused by Mr. Caceres's false arrest and imprisonment on June 11, 2025, he also endured extreme harm to his reputation, was severely hampered in his ability to carry out his job duties as a public defender, and suffered emotional distress as a result of the false arrest and imprisonment.

90.     After his arrest, Mr. Caceres's Secure Pass was revoked, and remained revoked for approximately one and a half months. His Secure Pass is what allowed him not only to visit clients in jail, but also to meet with them prior to any court appearances where they would be waiting in holding cells at the courthouse. This led to a breakdown in the attorney-client relationship with many of his clients. The Secure Pass also allows attorneys to bypass the security line at the Courthouse and enter through attorney entrances, as well as use the Law Library. Due to the temporary revocation of Mr. Caceres's Secure Pass, he was not permitted to utilize the attorney lines or the Law Library at the Courthouse. This was also detrimental to his ability to represent clients.

91.     Mr. Caceres's line of work is within the criminal justice system, and Defendants' false arrest and imprisonment of Mr. Caceres on June 11, 2025 have hampered his ability to interact with corrections officers without experiencing fear.

92.     Many national and local news organizations ran stories regarding Mr. Caceres's arrest, including but not limited to the New York Post,[7] the New York Daily News,[8] and The New York Times.[9]

93.     Mr. Caceres is now in private practice, and this incident has severely impacted, and continues to impact, Mr. Caceres's reputation with clients, potential clients, other counsel, prosecutors, and judges.

---

[7] Gabrielle Fahmy, *NYC Legal Aid Groug Finds More Trouble, As Lawyer Busted for Smuggling THC to Rikers Inmate*, New York Post (June 13, 2025, 3:33 PM), https://nypost.com/2025/06/13/us-news/queens-public-defender-arrested-for-peddling-thc-to-rikers-inmate-during-official-visit/ ("New York Post (6/13/2025)").
[8] Graham Rayman, *Queens Public Defender Arrested on Rikers With Drug-Soaked Legal Papers: COBA*, New York Daily News (June 13, 2025, 2:16 PM), https://www.nydailynews.com/2025/06/13/queens-public-defender-arrested-on-rikers-with-drug-soaked-legal-papers-coba/ ("New York Daily News (6/13/2025)").
[9] Taylor Robinson, *Public Defender Is Charged With Smuggling THC-Laced Paper Into Rikers*, The New York Times (June 13, 2025), https://www.nytimes.com/2025/06/13/nyregion/queens-defender-rikers-smuggling-thc.html.

94.     Additionally, Mr. Caceres's family and extended family live in New York, and they all read the news articles outlined *supra* reporting on his arrest for promoting prison contraband.

95.     Mr. Caceres's mental health has suffered as a result of the false arrest and confinement. Mr. Caceres's symptoms include anxiety and insomnia.

### The City's Widespread Custom and Practice of Arresting Visitors to Correctional Facilities for Promoting Prison Contraband Without Probable Cause

96.     For years, DOC employees have engaged in a custom and practice of arresting visitors to New York City correctional facilities without probable cause and based solely on field tests that return positive results for narcotics.

97.     New York City settled a 2019 lawsuit which showed DOC employees had arrested multiple visitors to DOC facilities based on positive presumptive field tests. Charges against those visitors were dropped as subsequent laboratory tests returned negative results for any controlled substances.[10]

98.     The custom and practice of arresting individuals at DOC facilities based on presumptive field tests continued, and even led to the arrest of at least two DOC staff members in 2023. In that case, the subsequent laboratory tests did not detect narcotics in any cognizable quantities.[11]

99.     While DOC may have begun using MobileDetect field tests instead of Nark II field tests in 2023, as outlined *supra*, DOI concluded that MobileDetect field tests return false positives at a rate of at least 79%,[12] and thus should not provide the basis for an arrest.[13]

_____

[10] 2024 DOI Report, *supra* note 1, at 13.
[11] *Id.* at 10 n. 22.
[12] *Id.* at 3 n. 7.
[13] *Id.* at 16.

15

100.    This practice and custom of treating field tests as reliable evidence of contraband is directly encouraged by DOC. Then-DOC Spokeswoman Annais Morales said the following about Caceres's arrest: "[w]e applaud the members of our K9 Unit who were able to prevent this contraband from coming into the jails."[14] Morales's statement clearly implied that DOC treated the field test as reliable evidence that the Discovery Documents did in fact contain narcotics.

101.    Additionally, former DOC commissioner Louis Molina[15] appeared in front of the New York City Council in 2022 and introduced photographs of many items sent to inmates at DOC facilities that he claimed were laced with fentanyl based on field tests administered by DOC.[16] Molina presented this "evidence" of narcotics-laced items brought into the jails to support a DOC policy proposal that incoming correspondence be scanned and given to inmates on tablets.[17]

102.    However, DOI stated that upon obtaining and testing some of the items Molina displayed at his testimony, including a child's drawing and a t-shirt, *none* of them tested positive for fentanyl when subjected to a lab test.[18]

103.    The practice of encouraging arrests based on presumptive field tests in order to advance a agenda was confirmed by COBA President Benny Boscio's statement after Mr. Caceres's arrest, where Boscio stated that the arrest of Mr. Caceres was "further proof of why

---

[14] New York Daily News (6/13/2025), *supra* note 8.
[15] Molina served as the Commissioner of DOC from January of 2022 through the Fall of 2023. *See* News Release, Office of the Mayor, New York City, Mayor Adams Appoints Louis Molina as Next Commissioner of Department of Citywide Administrative Services, (June 3, 2024), https://www.nyc.gov/mayors-office/news/2024/06/mayor-adams-appoints-louis-molina-next-commissioner-department-citywide-administrative.
[16] 2024 DOI Report, *supra* note 1, at 7.
[17] *Id.* at 6.
[18] *Id.* at 15.

paper documents brought by visitors should be scanned and downloaded electronically onto tablets before entering our facilities."[19]

104.    Prior to and at the time of Mr. Caceres's arrest, New York City had notice of the widespread and persistent custom and practice of arresting people at DOC facilities based on presumptive field tests, which cannot form the basis for probable cause.

105.    Prior to and at the time of Mr. Caceres's arrest, policymakers treated presumptive field tests as confirmatory, encouraging the practice of using them as the basis for an arrest.

***The New York City Correctional Officers Benevolent Association and Benny Boscio Make False and Defamatory Statements About Caceres***

106.    On June 13, 2025, COBA published a press release about Mr. Caceres's June 11, 2025 arrest.[20]

107.    In the press release, a picture of Mr. Caceres in handcuffs being led out of OBCC in handcuffs by Officer Vasquez was published. The caption to the photograph read, "Correction Intelligence Bureau Officer Vasquez escorting *drug peddling attorney Bernardo Caceres* out of OBCC."[21]

108.    Additionally, the press release had a statement from COBA President Benny Boscio, which read, in part, "[t]he fact that *this attorney would brazenly attempt to smuggle in a large quantity of THC into one of our biggest jails* is further proof of why paper documents brought by visitors should be scanned and downloaded electronically onto tablets before entering our facilities. . . . This attorney should be prosecuted to the fullest extent of the law."[22]

---

[19] Press Release, COBANYC, NYC Correction Officers Apprehended and Arrested an Attorney From the Queens Defenders Office for Allegedly Bringing an Inmate at Rikers Island Over 130 Pages of THC Laced Paper during a Scheduled Attorney Visit, (June 13, 2025), https://cobanyc.org/nyc-correction-officers-apprehended-and-arrested-an-attorney-from-the-queens-defenders-office-for-allegedly-bringing-an-inmate-at-rikers-island-over-130-pages-of-thc-laced-paper-during-a-scheduled-att/ ("COBA Press Release"). [https://perma.cc/2GEK-VHTD].
[20] *Id.*
[21] *Id.* (emphasis added).
[22] *Id.* (emphasis added).

17

109.    On June 13, 2025, the New York Post published a story about Mr. Caceres's arrest, using the photograph published in the COBA press release of Officer Vasquez leading Mr. Caceres out of OBCC in handcuffs, and quoting the portion of President Boscio's statement saying that Mr. Caceres "brazenly attempt[ed] to smuggle in a large quantity of THC."[23]

110.    These statements were false, as Mr. Caceres never attempted to bring THC into Rikers Island.

111.    Mr. Caceres is not a general or limited purpose public figure. He is not a household name, nor did he invite public attention or inject himself into any public controversy related to the issue of narcotics being brought into DOC facilities.

*Mr. Caceres Files a Timely Notice of Claim*

112.    Within ninety days after Defendants' June 11, 2025 unlawful arrest of Mr. Caceres, Mr. Caceres filed a notice of claim with the City Comptroller's Office.

113.    The Bureau of Law and Adjustment acknowledged receipt of Mr. Caceres's claim on September 3, 2025.

114.    Mr. Caceres never received notice of a hearing required under Section 50-h of the General Municipal law.

115.    This action has been commenced within one year of the events upon which the claims are based.

**FIRST CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
False Arrest and False Imprisonment
(Against Defendants Williamson and Does #1-8)

116.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

---

[23] New York Post (6/13/2025), *supra* note 7.

117.    Defendants Williamson and Does #1-8 wrongfully and illegally arrested Plaintiff or failed to intervene in his wrongful and illegal arrest.

118.    The wrongful, unjustifiable, and unlawful apprehension, arrest, and detention of Plaintiff was carried out without any basis, without Plaintiff's consent, and without probable cause, as no laboratory tests were administered to confirm the field tests results prior to Plaintiff's arrest.

119.    No reasonable officer would have believed that there was probable cause to arrest Plaintiff under these circumstances.

120.    Plaintiff was unlawfully, wrongfully, and unjustifiably held under arrest, deprived of his liberty, and falsely charged. At all times, the unlawful, wrongful, and false arrest of Plaintiff was without basis and without probable cause.

121.    All this occurred without any fault or provocation on the part of Plaintiff.

122.    Defendants Williamson and Does #1-8 intended to confine Plaintiff and, in fact, confined Plaintiff, and Plaintiff was aware of his confinement.

123.    Defendants Williamson and Does #1-8 acted under pretense and color of state law. Said acts were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and they acted willfully, knowingly, and with the specific intent to deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth and Fourteenth Amendments to the United States Constitution.

124.    The conduct of these Defendants was willful, wanton, and reckless.

125.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## SECOND CAUSE OF ACTION
Common Law False Arrest and False Imprisonment
(Against Defendants Williamson, Does #1-8, and the City of New York)

126.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

127.    Defendants Williamson and Does #1-8 wrongfully and illegally arrested Plaintiff or failed to intervene in his wrongful and illegal arrest.

128.    The wrongful, unjustifiable, and unlawful apprehension, arrest, and detention of Plaintiff was carried out without any basis, without Plaintiff's consent, and without probable cause, as no laboratory tests were administered to confirm the field tests results prior to Plaintiff's arrest.

129.    No reasonable officer would have believed that there was probable cause to arrest Plaintiff under these circumstances.

130.    Plaintiff was unlawfully, wrongfully, and unjustifiably held under arrest, deprived of his liberty, and falsely charged. At all times, the unlawful, wrongful, and false arrest of Plaintiff was without basis and without probable cause.

131.    All this occurred without any fault or provocation on the part of Plaintiff.

132.    Defendants Williamson and Does #1-8 intended to confine Plaintiff and, in fact, confined Plaintiff, and Plaintiff was aware of his confinement.

133.    The conduct of these Defendants was willful, wanton, and reckless.

134.    Defendant City of New York, as the employer of Williamson and Does #1-8, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

135.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

**THIRD CAUSE OF ACTION**
Violations of N.Y.C. Admin. Code §§ 8-801 to 8-807
(Against Defendants Williamson, Does #1-8, and the City of New York)

136.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

137.    Plaintiff's right to be free from unreasonable searches and seizures, as codified in 2021 N.Y.C. Local Law No. 48, N.Y.C. Admin. Code § 8-802, was violated by the conduct of Defendants Williamson and Does #1-8 when they unlawfully arrested and confined him, as detailed above.

138.    As a result of the above unlawful conduct, Plaintiff was caused to suffer the injuries hereinbefore alleged.

139.    Qualified immunity is not a defense to this claim pursuant to N.Y.C. Admin. Code § 8-804.

140.    Defendants Williamson and Does # 1-8 are liable for compensatory and punitive damages under N.Y.C. Admin. Code § 8-805.

141.    The City of New York is liable as the employer of Defendants Williamson and Does # 1-8 under N.Y.C. Admin. Code § 8-803(b).

**FOURTH CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
*Monell* Claim Against the City of New York
(Defendant City of New York)

142.    Plaintiff repeats and realleges the above paragraphs as if they were fully set forth at length herein.

143.    Plaintiff was wrongfully and illegally arrested due to Defendant City of New York's unlawful pattern, practice, custom, or policy of arresting visitors based solely on positive results for narcotics returned from presumptive field tests.

144.    As detailed above, this practice was directly encouraged by former DOC Commissioner Molina, an individual with the authority to set municipal policy regarding DOC practices.

145.    As detailed above, DOC has a custom or practice of arresting visitors for bringing contraband into DOC facilities without probable cause.

146.    The wrongful, unjustifiable, and unlawful apprehension, arrest, and detention of Plaintiff was carried out without any basis, without Plaintiff's consent, and without probable cause, as no laboratory tests were administered to confirm the field tests results prior to Plaintiff's arrest.

147.    All this occurred without any fault or provocation on the part of Plaintiff.

148.    Defendant City of New York intended to confine Plaintiff and, in fact, confined Plaintiff, and Plaintiff was aware of his confinement.

149.    As a direct and proximate result of the misconduct detailed above, Plaintiff sustained the damages hereinbefore alleged.

## FIFTH CAUSE OF ACTION
Common Law Defamation
(Against Defendants New York City Correctional Officers Benevolent Association and Benny Boscio)

150.    Plaintiff repeats and realleges the above paragraphs as if they were fully set forth at length herein.

151.    Defendant Boscio caused the publication of false statements of fact by Defendant COBA in a press release, which was, and still is, available on the internet for any person to see.

152.    In his statement in the COBA press release, Defendant Boscio—referring to Mr. Caceres—stated that "[t]he fact that his attorney would brazenly attempt to smuggle in a large quantity of THC into one of our biggest jails is further proof of why paper documents brought by

22

visitors should be scanned and downloaded electronically onto tablets before entering our facilities." He also stated that "[t]his attorney should be prosecuted to the fullest extent of the law."

153.    These statements were published in the June 13, 2025 COBA Press Release. The COBA Press Release featured a photograph of Mr. Caceres in handcuffs, used his full name in the caption of said photograph, and referred to Mr. Caceres as a "drug peddling attorney."

154.    The statements by COBA and Mr. Boscio were explicitly of and concerning Mr. Caceres.

155.    These statements by COBA and Mr. Boscio were intended to convey, and were understood by readers of ordinary intelligence as conveying, the factual assertion that Mr. Caceres "brazenly attempt[ed] to smuggle in a large quantity of THC into" Rikers Island and that Mr. Caceres was a "drug peddling attorney."

156.    On June 13, 2025, the New York Post published Mr. Boscio's statements that Caceres "brazenly attempt[ed] to smuggle in a large quantity of THC" in Rikers and also used the photograph of Mr. Caceres, crediting COBA.

157.    The statements made by COBA and Mr. Boscio were intended to convey, and were understood by readers of ordinary intelligence as conveying, the factual assertion that Mr. Caceres had committed a serious crime, *i.e.*, that he attempted to smuggle narcotics into Rikers Island. Thus, these statements are defamation *per se*.

158.    These statements are also defamation *per se* as they were intended to convey, and were understood by readers of ordinary intelligence as conveying, the factual assertion that Mr. Caceres used his position as an attorney to commit a crime, and thus directly prejudiced Mr. Caceres in his trade. As such, these statements are defamation *per se*.

159. The statements made by Defendants Boscio and COBA caused harm to Mr. Caceres's reputation.

160. Not only did Defendants Boscio and COBA fail to use reasonable care under the circumstances to verify the accuracy of the defamatory statements described herein, they also knew or reasonably should have known that their defamatory statements were false.

161. As a direct and proximate result of the publication of the false and defamatory statements described herein, Mr. Caceres has suffered damages, including injury to his reputation, emotional pain and suffering, and economic damages in an amount to be determined at trial.

162. COBA is liable for Boscio's tortious conduct both because it published Boscio's statement in its press release, and because it is vicariously liable for his statements on their own as Mr. Boscio was acting in the scope of his employment as President of COBA when he provided the statement regarding Mr. Caceres for the COBA Press Release.

## PRAYER FOR RELIEF

163. WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

a. Compensatory damages in an amount to be determined at trial;

b. Punitive damages against the Individual Defendants in an amount to be determined at trial;

c. Reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

d. Such other relief as this Court may deem just and proper.

Dated: June 10, 2026
New York, New York

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

Earl Ward
Albert Huber (Pro Hac Vice Motion
Pending)
1 Rockefeller Plaza, 8th Fl.
New York, New York 10020
(212) 763-5000

Raymond Queliz (Admission to
Southern District of New York
Pending)
Caicedo & Queliz, LLC
118-35 Queens Blvd, Ste 400
Forest Hill, NY 11375

*Attorneys for Plaintiff Bernardo
Caceres*

25